In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 23-3415

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ERIC KYEREME,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cr-00363-1 — **Mary M. Rowland**, *Judge.*

---

ARGUED OCTOBER 28, 2024 — DECIDED FEBRUARY 3, 2025

---

Before ROVNER, BRENNAN, and KOLAR, *Circuit Judges.*

KOLAR, *Circuit Judge.* After pleading guilty to wire fraud, Eric Kyereme was sentenced to three years' imprisonment, three years of supervised release, and was ordered to pay $185,500 in restitution. On appeal, Kyereme argues that the district court erred by determining that his transaction with a business associate, Da Zhou, was within the scope of his conviction. Kyereme also contends that the district court provided insufficient notice that it would rule on the Zhou

transaction at the final sentencing hearing. We reject both of Kyereme's arguments and affirm his sentence.

## I. Background

In 2020, Kyereme was indicted on five counts of wire fraud in violation of 18 U.S.C. § 1343. Although he proceeded to trial, after opening statements and testimony from two witnesses, Kyereme entered a blind guilty plea to count one of the indictment.

Kyereme admitted to running a scheme to mislead investors in his company, Sika Capital Management, LLC. It started when Kyereme solicited $200,000 of investments from individual investors for Sika's "Alpha Fund." He deposited these funds into a brokerage account and began trading. The trading went poorly. Eventually, the Alpha Fund brokerage account had lost all but $17,112 of the original $200,000 investment. In response to the losses, Kyereme did not tell his investors he lost their money. Rather, he created fake account statements and sent out newsletters that falsely reflected positive returns. He hoped this deception would allow Alpha Fund to retain the remaining investment funds.

What Kyereme expressly reserved from his guilty plea, however, was an admission of wrongdoing with respect to a business associate named Da Zhou. Zhou did not invest in the Alpha Fund. Instead, Kyereme's interactions with Zhou pertain to RestoreFlow Allografts (RFA), a start-up company that distributed cryopreserved tissue taken from deceased people to living patients. Kyereme served on RFA's board of directors and owned a portion of the company through his shares in Primrose Health, LLC, which held an equity stake in RFA. Kyereme and the government agreed at the plea hearing

that the district court would decide during sentencing whether Kyereme's dealings with Zhou were part of his wire fraud offense. Additionally, Kyereme moved to bifurcate sentencing, with an evidentiary hearing on the Zhou transaction to occur before the final hearing. The district court granted the motion and scheduled a hearing for August 2023.

At the August 2023 hearing, the government presented evidence that Kyereme defrauded Zhou of $133,000 as part of his scheme to cover up Alpha Fund's losses. In the government's telling, Zhou wanted to invest in RFA, and Kyereme said he would facilitate the investment by creating a new legal entity that would purchase and manage newly-offered RFA shares on behalf of Zhou. But Kyereme never formed that entity. The government presented a forensic accounting report to show that shortly after Kyereme received $133,000 from Zhou, he transferred $100,000 into the dwindling Alpha Fund brokerage account and purchased 1,000 shares of a high-risk investment. The investment proved unsuccessful.

Kyereme testified that his transaction with Zhou was a legitimate sale. He said that although Zhou originally wanted to purchase new RFA shares directly, Zhou ultimately agreed to pay $133,000 for a portion of Kyereme's interest in RFA by buying part of his Primrose equity. In other words, Kyereme testified he earned Zhou's money in exchange for Primrose equity and was free to invest it as he pleased.

The government cross-examined Kyereme with two documents related to RFA. First, the government introduced the operating agreement for Primrose, which prohibited Kyereme from transferring his interest in Primrose (and thus RFA) during the time period that he allegedly sold some of it to Zhou. Kyereme testified that he had not read the full

operating agreement and did not know about the restriction. Second, the government showed Kyereme that the written membership agreement between him and Zhou envisioned an entity that would invest Zhou's money into RFA shares directly and did not mention purchasing Kyereme's interest in RFA. Kyereme responded that a lawyer drafted the document and he did not examine it in detail.

The evidentiary hearing also revealed that after another company bought RFA's assets and Kyereme received an initial distribution of $79,000 from the sale, he did not send Zhou any portion of the money. Kyereme testified that he was waiting for the full distribution before sending Zhou his percentage, thinking it would come within a few days. Kyereme's contact at Primrose stopped responding to him and the rest of the distribution never came; Kyereme never passed any of the money along to Zhou.

At the second and final sentencing hearing, which occurred in December 2023, the district court endorsed the government's position that Kyereme had defrauded Zhou. The court stated that it did not believe Kyereme and would not credit his testimony. It further found that the membership agreement and the Primrose operating agreement were both inconsistent with Kyereme's portrayal of the Zhou transaction. And it deemed the government's accounting report to be a "very damning" demonstration that Kyereme attempted to use Zhou's money to cover up the Alpha Fund's losses. The district court also observed that Kyereme used the remaining money from Zhou to pay off personal debts.

The district court ruled that the total loss amount from Kyereme's offense was $335,500, including the "straightforward" $200,000 from the Alpha Fund investors and $135,500

in loss incurred by Zhou.[1] With Zhou's money included, the total loss amount of $335,500 led to a 12-point increase to the offense level under United States Sentencing Guidelines § 2B1.1, greater than the 10-point increase it would be without that addition. The court calculated an offense level of 21 and a Guidelines range of 41 to 51 months' imprisonment.

The district court sentenced Kyereme to 36 months' imprisonment followed by three years of supervised release. It ordered him to pay $185,500 restitution to the victims, including $135,500 to Zhou.[2] The district court emphasized that it found the Zhou transaction to be "much more troubling" than the deceptive information sent to Alpha Fund investors, deeming it "blatant criminal conduct." Because Kyereme had not expressed any remorse about the Zhou transaction during his allocution, the court concluded that a carceral sentence was necessary to deter Kyereme from future criminal conduct.

Kyereme now appeals.

## II. Analysis

Kyereme first takes issue with the district court's finding that the Zhou transaction was part of the wire fraud offense. He also argues he lacked notice that this decision would be made at his final sentencing hearing rather than beforehand. Neither challenge is persuasive.

---

[1] In addition to the $133,000 he transferred to Kyereme, Zhou also incurred a $2,500 loss from payments to a lawyer who drafted the membership agreement between him and Kyereme.

[2] This number is lower than the $335,000 total loss amount because it reflects prior payments Kyereme made to two of the victims.

## A. THE DISTRICT COURT DID NOT CLEARLY ERR

According to Kyereme, the district court clearly erred by finding that the Zhou transaction was fraudulent and that the resulting loss was part of his wire fraud scheme. Including the Zhou transaction in the loss amount raised Kyereme's offense level to 21 and led to a Guidelines range of 41 to 51 months' imprisonment. "We review a district court's interpretation and application of the Sentencing Guidelines de novo and its factual findings for clear error." *United States v. Sykes*, 774 F.3d 1145, 1149 (7th Cir. 2014). Likewise, we review Guidelines findings of loss amounts for clear error.[3] *United States v. White*, 883 F.3d 983, 986 (7th Cir. 2018).

"A district court need find only, by a preponderance of the evidence, that the facts are sufficient to support an enhancement." *United States v. Prieto,* 85 F.4th 445, 448 (7th Cir. 2023). "[W]hen a district court chooses between two permissible inferences from the evidence, the factual findings cannot have been clearly erroneous." *United States v. Cruz-Rea*, 626 F.3d 929, 938 (7th Cir. 2010). In sum, a finding of fact is clearly erroneous only when, after considering all the evidence, we are "left with the definite and firm conviction that a mistake has been made." *United States v. Dickerson*, 42 F.4th 799, 804 (7th Cir. 2022) (quoting *Cruz-Rea,* 626 F.3d at 938).

Courts "aggregate losses to victims of 'the same course of conduct or common scheme or plan' as the offense of conviction." *United States v. Meza*, 983 F.3d 908, 915–16 (7th Cir. 2020) (quoting U.S.S.G. § 1B1.3(a)(2)). "Because the offense of wire fraud is a scheme, the loss amount can include losses incurred

---

[3] If supported by sufficient evidence, the district court's findings lead to a higher offense level. Kyereme does not argue otherwise.

in the entire scheme….” *Id.* at 916. A defendant challenging a loss calculation “bears a heavy burden: he must ’show that the court’s loss calculations were not only inaccurate but outside the realm of permissible computations.’” *United States v. Collins*, 949 F.3d 1049, 1053 (7th Cir. 2020) (quoting *United States v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013)).

To begin, Kyereme insists that the district court viewed the Zhou transaction as a separate fraud and failed to analyze whether it was “relevant conduct” to the offense of conviction. *See, e.g.*, *United States v. Burnett*, 805 F.3d 787, 791 (7th Cir. 2015) (explaining that under the Guidelines, “relevant conduct” can include acts that are not part of a common scheme, as long as they are part of the same course of conduct). Not so. The sentencing transcript shows that the district court determined Zhou was a victim of the same wire fraud offense that Kyereme pleaded guilty to, and that Zhou’s losses were “loss[es] in the fraud.” The district court also ordered restitution, and “[r]estitution must be based on the offense of conviction, not relevant conduct.” *United States v. Frith*, 461 F.3d 914, 916 (7th Cir. 2006). To the extent this case involves relevant conduct, it is only because the Guidelines define relevant conduct to include “conduct that constitutes the offense of conviction….” *Edwards v. United States*, 523 U.S. 511, 514 (1998) (citing U.S.S.G. § 1B1.3(a)(1)). This appeal is not about whether the Zhou transaction was “part of the same course of conduct or common scheme or plan as the offense of conduct.” U.S.S.G. § 1B1.3(a)(2).

With that in mind, we turn to the substance of the district court’s findings and hold that they are supported by ample evidence in the record. The membership agreement between Kyereme and Zhou prescribed that Kyereme would create a

shared investment entity to purchase shares of RFA. Kyereme testified that the membership agreement did not accurately capture the nature of the transaction and that Zhou actually agreed to indirectly purchase some of Kyereme's existing RFA shares by buying part of his Primrose equity. Even if we were to accept that Kyereme and Zhou were content to proceed with a written contract that incorrectly reflected their agreement, there are other problems with Kyereme's testimony. For one, the Primrose operating agreement prohibited Kyereme from transferring his interest in Primrose. What's more, Kyereme's conduct did not align with the transaction he described in his testimony. He never transferred a portion of his shares to Zhou and never gave Zhou any of the money that was distributed after RFA was purchased.

If Kyereme is to be believed, his conduct was not fraudulent but instead exceptionally careless. He purportedly did not read the Primrose operating agreement governing his RFA shares, signed the membership agreement without noticing that it laid out a different transaction than he and Zhou had agreed to, forgot to set up an entity to transfer his interest in RFA, and indefinitely delayed sending Zhou the proceeds from RFA's sale because he thought more money was coming in the near future and preferred to send it all at once. That chain of events is implausible. Thus, it was not clear error for the district court to decline to credit Kyereme's testimony. Nor was it clear error for the district court to adopt the plain interpretation of events: Kyereme defrauded Zhou as part of the fraudulent scheme laid out in the indictment. In the words of the indictment, "[i]t was further part of the scheme that defendant Eric Kyereme told at least one investor that his funds would be invested in [RFA] … [c]ontrary to his representations to the investor, Kyereme did not invest that money in [RFA]."

The district court also had sufficient evidence to conclude that the fraud on Zhou was part of Kyereme's scheme to deceive the Alpha Fund investors. As shown by the accounting report introduced by the government, Kyereme took the money he received from Zhou and immediately put most of it into a high-risk investment made through the Alpha Fund. Kyereme testified that this maneuver was not an attempt to hide the Alpha Fund's losses because if the investment was successful, the benefits would have accrued to him rather than the Alpha Fund investors. Yet this contention about how the Alpha Fund worked is hard to square with the fact that Kyereme transferred the money into the same brokerage account that held the investors' dwindling funds. Such an influx, and the possibility of positive investment returns, would have aided Kyereme's efforts to mislead investors about the account's performance. That is enough evidence for the district court to link the Zhou transaction with Kyereme's fraud against the Alpha Fund investors.

In short, the district court did not clearly err in finding that Kyereme defrauded Zhou as part of his wire fraud scheme to deceive the Alpha Fund investors. Consequently, the district court properly included Zhou's $135,500 loss when calculating the total loss amount of the offense. *See Meza*, 983 F.3d at 916. And the district court was well within its discretion to rely on the Zhou transaction when determining Kyereme's sentence.

## B.  THE DISTRICT COURT PROVIDED SUFFICIENT NOTICE

Kyereme also argues that the district court indicated that it would rule on the Zhou transaction before the final sentencing hearing, leaving him unprepared to address the court's

decision at that hearing. But the record contradicts this assertion.

"Whether the district court followed proper sentencing procedure is a legal question reviewed de novo." *United States v. Pulley*, 601 F.3d 660, 664 (7th Cir. 2010). "At sentencing, the court … must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary…." Fed. R. Crim. P. 32(i)(3)(B). "[T]he requirements of due process during a sentencing hearing are met if the defendant is given adequate notice of the proceeding and an opportunity to contest the facts relied upon to support the imposed criminal penalty." *United States v. Freeman*, 815 F.3d 347, 355 (7th Cir. 2016) (quoting *United States v. McCoy*, 770 F.2d 647, 649 (7th Cir. 1985)).

The district court twice made clear that it would rule on the Zhou transaction at the final sentencing hearing—once during the August 2023 evidentiary hearing and again in a December 2023 order. Kyereme notes that at a July 2023 hearing, the district court suggested that it would decide the issue "the first week of August" and then "come back a month later and do the sentencing." But at the end of the August 2023 evidentiary hearing, the district court announced a different plan for a final sentencing hearing where it would "come out and rule on all the sentencing guidelines" and then "[t]ake a break, and … impose [the] sentence." Kyereme did not object. The final sentencing hearing was originally set for September 2023 and then postponed three times due to scheduling conflicts. In December 2023, a week before the sentencing hearing, Kyereme moved to continue the hearing until after the district court ruled on the Zhou transaction. Four days before the sentencing hearing, the district court denied the motion,

which once again established it would decide the issue at the sentencing hearing. The record leaves no doubt that Kyereme had sufficient notice of the district court's intentions and an adequate opportunity to prepare for an adverse decision.

### III. Conclusion

The district court's findings were not clearly erroneous and the district court provided sufficient notice that it would rule on the Zhou transaction at the final sentencing hearing. We AFFIRM Kyereme's sentence.